```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3  SAMUEL JONATHAN ANTHONY, JR.,   .
                                    .  Case Number 19-CV-2441
 4            Petitioner,           .
                                    .
 5        vs.                       .  Washington, D.C.
                                    .  September 6, 2019
 6  WILLIAM P. BARR, et al.,        .  9:11 a.m.
                                    .
 7            Respondents.          .
    - - - - - - - - - - - - - - - - -
 8

 9      TRANSCRIPT OF TELEPHONIC PRELIMINARY INJUNCTION HEARING
                BEFORE THE HONORABLE DABNEY FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Petitioner:        GREGORY COPELAND, ESQ.
                               Rapid Defense Network
14                             11 Broadway, Suite 615
                               New York, New York 10004
15

16  For the Respondent:        PATRICIA MC BRIDE, ESQ.
                               United States Attorney's Office
17                             555 Fourth Street Northwest
                               Washington, D.C. 20530
18

19

20

21  Official Court Reporter:   SARA A. WICK, RPR, CRR
                               333 Constitution Avenue Northwest
22                             U.S. Courthouse, Room 4704-B
                               Washington, D.C. 20001
23                             202-354-3284

24

25  Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(Call to order of the court.)

THE COURTROOM DEPUTY:  Good morning, Your Honor.  This is Civil Case year 2019-2441, Samuel Jonathan Anthony versus William P. Barr, et al.

Counsel, please introduce yourselves for the record, beginning with the petitioner.

MR. COPELAND:  Good morning, Your Honor.  This is Gregory Copeland of the Rapid Defense Network for Mr. Anthony, the petitioner.

THE COURT:  Good morning, Mr. Copeland.

MS. MC BRIDE:  Good morning, Your Honor.  Patricia McBride on behalf of the defendant.

THE COURT:  Good morning, Ms. McBride.

Thank you all for being available.  I do want to encourage you to keep your voices up and try not to speak through a speakerphone.  I don't know if the courtroom deputy has already told you that, but it is really difficult with the acoustics in here to hear you all, and the court reporter needs to for sure hear you.

All right.  I have read your briefs on the motion for preliminary injunction, and I wanted to give both parties a chance to update me on any new facts that might impact my decision.  I also have a few questions for both sides.

So Mr. Copeland, let me start with you.  Are there any new

1  facts that I should be aware of?

2          MR. COPELAND:  Not from the petitioner, Your Honor.

3          THE COURT:  All right.  Ms. McBride?

4          MS. MC BRIDE:  Your Honor, I don't believe there are

5  any new facts.  However, I just received an e-mail from the

6  agency that actually handles U Visa -- U Visas indicating that

7  certain information cannot be divulged, and the attorney who

8  handles petitioner's U Visa is --

9          THE COURT:  Ms. McBride, hold on.  We cannot hear you.

10  Are you on a cell phone?

11          MS. MC BRIDE:  Yes, I am on a cell phone.

12          THE COURT:  You are on a cell phone?

13          MS. MC BRIDE:  Yes.

14          THE COURT:  All right.  It is very difficult to hear

15  you.  I don't know if you can speak from a landline and call

16  back.  But we are having a really hard time hearing your voice.

17          MS. MC BRIDE:  I am out of the office today, and I

18  cannot speak on a landline.

19          THE COURT:  All right.  You are really going to have

20  to speak directly into the voice box here.  We cannot hear you.

21          MS. MC BRIDE:  Okay.  Is this any better?

22          THE COURT:  It's a little bit better.

23          MS. MC BRIDE:  Okay.  I am sorry.  So Patricia McBride

24  again.

25      I don't have any new facts.  I was just sent an e-mail from

1   the agency that actually handles the U Visa, and depending on

2   what information is -- may be needed, they have indicated that

3   the attorney who handles the U Visa is not the same attorneys

4   who are handling this matter, and certain information cannot be

5   divulged because of rules and regulations dealing with the

6   U Visa.

7       That's the only information that I have.

8       THE COURT:  All right.  Mr. Copeland, let me start

9   with you.  As I understand it, the relief you seek here is to

10  have me enjoin the attorney general and the DHS from removing

11  Anthony from the United States until his application for U Visa

12  is fully adjudicated; is that correct?

13      MR. COPELAND:  Yes, that's correct, from enjoining it

14  just for the temporary period of the adjudication of the U Visa,

15  yes.

16      THE COURT:  All right.  So my question is this:  To

17  the extent that any court has jurisdiction to hear the claims

18  you raise, why is that court not the Fourth Circuit Court of

19  Appeals?

20      Doesn't Title 8 United States Code Section 1252(b) require

21  that any challenge relating to an order of removal be brought

22  before the court of appeals in the circuit in which the order of

23  removal was entered?

24      MR. COPELAND:  Well, Your Honor, that's correct if

25  this was, you know, a direct challenge to the order of removal

1    or to any of the challenges that 1252 channels to the circuit

2    courts.

3        This, however, is not such a challenge.  And so while on

4    its face it appears to broadly divest jurisdiction, both the

5    Supreme Court in the *Reno* case as well as the *Jennings* case

6    indicated that that's through a narrow reading.

7        So our argument is that this is not a direct challenge, nor

8    is it one of the types of cases that are channeled to the

9    circuit court such that this court, like several other courts

10   around the country have found, that there would be jurisdiction

11   to determine this precise issue.

12        THE COURT:  All right.  Well, no matter how you frame

13   or you label the issue, at bottom, it seems to me you are

14   seeking a stay of the order of removal, and that requires me to

15   review that final order of removal.

16        To me, it seems like what you are challenging here is

17   inextricably linked to the removal order.

18        MR. COPELAND:  Well, petitioner's position would be

19   that we are not challenging the propriety of the removal order.

20   And, you know, pursuing this process that he is asking the

21   opportunity to pursue, it may well -- it may well succeed; it

22   may well fail.  Neither of those things is necessarily going to

23   have a direct impact on that removal order.

24        THE COURT:  But aren't you -- essentially, you're

25   saying that the process that's being employed to remove him is

1    unlawful.

2         MR. COPELAND:  We are saying, yes, the process being

3    employed to remove him is unlawful, which is distinct from

4    saying that it would be unlawful to remove him in any manner.

5    We would say if the government were to apply a lawful process,

6    that there would be an opportunity to effect the removal order

7    at the end of the exhaustion of that lawful process.

8         THE COURT:  All right.  It does seem to me that this

9    relates to -- 1252(b) has broad language.  It relates to an

10   order of removal.  And so I am having a hard time understanding

11   why that doesn't strip me of jurisdiction to entertain your

12   claim.  It seems to me the attorney general's decision to

13   execute the 2011 removal order against Anthony falls within the

14   plain language of 1252(g).

15        MR. COPELAND:  And I don't think that we would dispute

16   that.  However, we would point to the *Reno* and the *Jennings*

17   cases as indicating that despite the broad language, that they

18   are due a narrow reading.  And as district courts around the

19   country have found, the fact that there's a -- the removal order

20   is implicated by the case doesn't necessarily indicate that

21   jurisdiction is stripped.

22        And further, we would argue that even if it were to be

23   found that jurisdiction was stripped, that to do so in this

24   manner would be a violation of the suspension clause as applied

25   to Mr. Anthony.  His ability to pursue his form of relief

1    wouldn't be provided the opportunity for judicial review in a

2    meaningful manner.

3            THE COURT:  But how can there be a suspension clause

4    problem when his claims can be heard in the court of appeals and

5    that is an adequate and effective alternative?

6        He can file a motion to reopen and file a petition for

7    review.  Why does that not remove any potential problem under

8    the suspension clause?

9            MR. COPELAND:  Well, he at this point would not be

10   able to pursue this particular -- this particular claim, the

11   jurisdiction is with USCIS.  So the agency that would be

12   reviewing and determining this claim wouldn't be the agency that

13   would review the claim -- that would be reviewing the claim

14   pursuant to the typical PFR process.

15       So even if he were to file a motion to reopen and then were

16   to get review in the circuit court, the circuit court would then

17   make the decision as to the final order of removal rather than

18   to what Mr. Anthony's claims are, which go towards the U Visa

19   and the U Visa process.

20           THE COURT:  I know.  But what he really wants is to

21   not be removed; right?  I mean, you don't want DHS to remove

22   him.

23           MR. COPELAND:  Yes, that's absolutely clear.  But that

24   does not translate what his claim is to, you know -- to a claim

25   that he can be pursuing anywhere other than in this court at

1    this time such that there is not an alternative process that is

2    available to him.  If he were -- if the government were able to,

3    you know, stay his case and allow him to pursue a motion to

4    reopen and pursue, you know, a claim through the process of

5    review, then potentially it would moot out the immediacy of this

6    claim, but it wouldn't be providing the alternative process that

7    the suspension clause would require.

8            THE COURT:  Well, I'm not even -- I'm having a hard

9    time understanding why this is really a habeas claim.  I mean,

10   what Anthony wants is not to be released from confinement; he

11   wants to be protected from removal.

12           MR. COPELAND:  Well, he wants to be protected from

13   unlawful government encroachment, and many courts have held

14   that, you know, being held in custody is a fairly flexible term.

15   And as such, you know, relief to a country where an immigration

16   judge and the Board of Immigration have both found that, you

17   know, his fear of harm is both credible and realistic, you know,

18   that sort of relief we wouldn't argue -- we would argue, you

19   know, wouldn't be a release from custody, and just having a

20   final order of removal is sufficient within the habeas law to be

21   within -- in custody within the terms of the statute such that

22   this is a process-based habeas claim, as has been brought, you

23   know, around the country.

24           But the core of habeas has been used to attack unlawful

25   detention, but it's also the backstop and the most -- and the

1    most flexible remedy, you know, enjoined in the Constitution

2    to -- and as the Supreme Court has said, to be able to address

3    all forms of unlawful executive action.

4         THE COURT:  But Congress amended 1252 to make clear

5    that federal courts don't have habeas jurisdiction over

6    immigration claims; correct?

7         MR. COPELAND:  Well, they don't have jurisdiction over

8    a distinct set of habeas claims.  Those issues are stripped of

9    jurisdiction, which are motivated by the idea of having the PFR

10    process be channeled into, you know, one direct path, right, so

11    that we don't have alternative, you know, venues and decisions.

12         But that's not what the challenge is here.  The challenge

13    to Mr. Anthony's request relating to his U Visa wouldn't be

14    appealable, you know, to the circuit in the way that 1252 was

15    designed in the Real ID Act to channel the process of

16    specifically removal proceedings.

17         THE COURT:  Right.  Well, the alleged injury here, as

18    I understand it, is the lack of notice to Mr. Anthony, is that

19    correct, the lack of notice on revoking his order of suspension;

20    right?

21         MR. COPELAND:  Yeah, the order of supervision, that's

22    correct, Your Honor.

23         THE COURT:  And that's the alleged injury, is that he

24    wasn't provided notice?

25         MR. COPELAND:  The alleged injury is, A, he wasn't --

the alleged injury is that there is essentially an *Accardi*
Doctrine and a Fifth Amendment issue in terms of, A, that he
wasn't provided notice with how his -- in not being provided
notice, that would just be a straight procedural due process
issue in terms of not providing him meaningful process at a
meaningful time before the revocation of his release.

Then there's also the injuries of not be allowed to exhaust
his process, which is pursuing his legal right to the law, which
as the First Circuit found in the *Arvelo* case he would have the
right to try and the right to pursue the processes specifically
held out to him, not necessarily to -- and certainly not the
right to obtain that relief, but the right to pursue it.

Our position would be that that would be an injury to his
due process, his Fifth Amendment rights, and his rights under
the APA to pursue and exhaust relief made available to him.

THE COURT:  All right.  Well, has -- I'm not even
sure, if I do reach the merits, that Anthony has shown that he
meets the eligibility criteria for a U Visa.  How does he have a
liberty interest in a U Visa deferred status?

As the government notes, he can apply for the U Visa
abroad.  And as I understand it, he can only get on the wait
list if DHS first decides he is eligible for a U Visa and then
denies it because of the 10,000 cap.

Before me, has he shown that he is eligible for a U Visa?
It's a discretionary decision by DHS.

1    MR. COPELAND:  I would argue, first of all, that he

2 has -- he indisputably has a right to that process.  Whether or

3 not sort of the -- he will succeed on it, we believe, you know,

4 he has been certified for it.  It is the type of crime and what

5 had happened to him, there is nothing indicating that he would

6 not be eligible for it.  And we would say that his application

7 is a very strong application in demonstrating he would be

8 eligible for it.

9    In terms of the cap, you know, while there is a cap on it,

10 these numbers, there's a backlog at this point in the hundreds

11 of thousands, and there's 10s -- I believe there's 40 --

12 approximately 30- or 40,000 applications for a U Visa each year

13 such that the backlog continues to grow and grow and grow, such

14 that not only do we -- our position would be that the

15 appropriate analysis would be on the right to pursue it rather

16 than on the likelihood of the success of the ultimate form of

17 relief, which Mr. Anthony is not making any sort of claims that

18 he has the right to that ultimate form of relief.  He is arguing

19 that he has the right to pursue that process to its exhaustion.

20    THE COURT:  And I want to make sure that I understand

21 the basis for pursuing this.  So he was a victim in a 1991

22 assault; correct?

23    MR. COPELAND:  That's correct, yes.

24    THE COURT:  And the idea is that he would stay here to

25 help the government prove that case that presumably the Statute

1   of Limitations has long run?

2   　　　　MR. COPELAND:  Well, the thrust of the U Visa is to

3   encourage people to come forward and to, you know, participate

4   in the prosecution of crimes.  So, you know, clearly, he is not

5   going to be sort of -- or most likely, there is not going to be

6   a prosecution resulting from Mr. Anthony's subsequent assistance

7   to law enforcement.

8   　　　But that's also not sort of a critical determination of the

9   granting of a U Visa.  The U Visa doesn't require that the

10  cooperation with law enforcement be prospective or in the

11  future.  There are other visas, the Yes Visa and other forms of

12  relief that go into that.  But the U Visa, Congress's intent

13  was, you know, to make it such that it would encourage people to

14  provide information as to prosecutions.  And it's not even

15  required that there actually end up being any sort of formal

16  proceedings, any indictment or anything or for the victim's

17  assistance to go forward and assist in a substantial way or to

18  achieve any particular result.  The only requirement there would

19  be that he did cooperate, which law enforcement has certified

20  that his cooperation at that time was sufficient to establish

21  that, you know, he was granted the law enforcement certification

22  for his U Visa.

23  　　　　THE COURT:  So he cooperated in 1991, and he's got

24  presumably, you're suggesting, continued cooperation now, and

25  that's why he is eligible --

1          MR. COPELAND:  No, he is not required to have

2     continued cooperation.  Part -- the U Visa is designed to

3     encourage people to come forward, you know, so there isn't a

4     requirement within the U Visa that the cooperation, you know, be

5     continuing or be going forward or anything of that form.  So the

6     timing of the assistance, you know, provided by Mr. Anthony

7     isn't relevant to the U Visa evaluation.

8          THE COURT:  All right.  Mr. Copeland, I want to make

9     sure that I have the facts straight.  So as I understand it,

10    Mr. Anthony was granted lawful permanent resident status in

11    1989; correct?

12         MR. COPELAND:  That's correct, yes, Your Honor.

13         THE COURT:  And since then, he's been convicted of

14    several offenses.  He was incarcerated from 1991 until --

15    consistently until, was it, 2011?

16         MR. COPELAND:  That's correct, Your Honor.

17         THE COURT:  So roughly 22 years?

18         MR. COPELAND:  Maybe I am doing my math wrong, but for

19    in excess of 15 years at least, yes.

20         THE COURT:  But he was released from prison in 2001

21    and immediately taken into ICE custody?

22         MR. COPELAND:  That's my understanding, Your Honor.

23         THE COURT:  Okay.  And you mentioned earlier that the

24    immigration judge granted him deferral of removal under the

25    Convention Against Torture, but on appeal, is this correct, the

1   Board of Immigration Appeals vacated that and ordered him

2   removed in 2011?

3        (Background noise.)

4            MR. COPELAND:  Apologies, Your Honor.

5            THE COURT:  That's all right.

6            MR. COPELAND:  Could I propose that Ms. McBride, if it

7   would be possible to --

8            THE COURT:  Mr. Copeland?

9            MS. MC BRIDE:  I'm changing rooms.  I'm sorry about

10  that.  Patricia McBride.

11           THE COURT:  Does Mr. Copeland need a break?

12           MR. COPELAND:  No, no.  Sorry.  I struggled to -- we

13  left off, so he was incarcerated for a substantial period of

14  time following his conviction.  He was released.  He was -- the

15  immigration judge granted him deferral of action, found him to

16  be credible in regards to his fear of returning to Sierra Leone.

17       Subsequently, the Board of Immigration reversed the

18  immigration judge's decision but crucially upheld his

19  credibility and overturned the decision based off of not finding

20  there to be a nexus with the injury, the claimed torture he

21  would suffer if returned to Sierra Leone.  The Board of

22  Immigration Appeals did state that his fear was not unreasonable

23  and did not challenge his credibility but, obviously, did

24  overturn the immigration judge's decision.

25       Subsequently, he was released on an order of supervision

1    and, you know, has lived a very productive life as a

2    contributing member of the community since he's been on his

3    order of supervision.

4            THE COURT:  All right.  So he has been on an order of

5    supervision since May of 2012?

6            MR. COPELAND:  That's our understanding, Your Honor,

7    yes.

8            THE COURT:  All right.  As I understand it, he was

9    interviewed in April of 2019, on April 30th, by the embassy of

10   Sierra Leone to determine whether he was a citizen and whether a

11   travel document could be issued; is that correct?

12           MR. COPELAND:  Your Honor, we have -- I have not been

13   able to confirm that.  I have not had the opportunity to speak

14   to Mr. Anthony since the government's declaration of

15   August 28th.  That may well have happened.  That may -- I can't

16   speak to that.

17           THE COURT:  All right.  On your claim that he hasn't

18   received sufficient notice, according to DHS's declaration, 2018

19   through 2019, ICE requested documents that Anthony knew were

20   needed for his travel document application.

21           Also according to the government, in April 2019, he was

22   interviewed by the embassy of Sierra Leone to see if he was a

23   citizen so a travel document could be issued.

24           And then also according to the DHS declaration that's based

25   on the A-File, on July 31st, 2019, ICE served Anthony with a

1    notice of revocation of release.

2         Now, you say they haven't provided you with a copy of that,

3    but what do I have to rebut that that's the -- these are the

4    facts and that he was, in fact, provided notice?

5         MR. COPELAND:  We would argue that -- and we would

6    contest those facts, you know, the fact that we haven't been

7    provided nor has his immigration attorney been provided with,

8    you know -- with what would be a very easy document for the

9    government to have included as an exhibit, you know.

10         THE COURT:  But why is it the government's burden?

11    The government is asserting he was provided notice.  Is the

12    absence of a copy of that document something that disputes that?

13    I mean, you have given me nothing on the other side.

14         MR. COPELAND:  Well, part of that is because the

15    government would have this document and would have to have

16    served this document.  And clearly, they haven't served it on

17    the individual who they knew was his representative at the time,

18    who is the declarant that provided the declaration included in

19    our filing, Fabienne Chatain.

20         And so the statements within the deportation officer's

21    declaration, which these -- stating that you are being required

22    or asked to be provided travel documents is essentially what

23    happens at every single order of supervision check-in.  That's a

24    part of the order of supervision that's on the form that you

25    signed, that you have to be compliant, and this is something

that, you know, is the standard questions asked of everybody
when you are checking in for order of supervision.

It does not amount to being provided notice that you are
going to be, after living in the country for almost 40 years,
suddenly as you are pursuing a process that's held out to you,
you know, very shortly after performing biometrics in pursuit of
that process, that you are going to be detained and
expeditiously removed.

Mr. Anthony had been complying with his order of
supervision since 2012 and had, you know, been providing the
same assistance to the Department of Homeland Security in
complying with the order of supervision, part of which is
included in that is trying to assist in obtaining documents such
that if he had not been doing so, there would have been a basis
for the revocation of his order of supervision.

Mr. Anthony, we have not seen the order of supervision, and
it is ICE's practice to serve the order of supervision on the --
an individual's representative.  So our position would be that
the --

THE COURT:  Mr. Copeland, sorry to interrupt you, but
we're not sure that Ms. McBride is still on the line.

Ms. McBride, are you there?  All right.  Apparently, I
don't know at what point, but it seems, Mr. Copeland --  oh, is
that you, Ms. McBride?

MS. MC BRIDE:  I'm sorry.  I lost the call.

1        THE COURT:  What was the last thing that Mr. Copeland

2    said when you dropped the call?

3        MS. MC BRIDE:  Mr. Copeland was talking about the --

4    his affidavit of the former attorney indicating that the former

5    attorney didn't receive notice.  That was the last thing I

6    heard.

7        THE COURT:  Mr. Copeland, do you want to briefly make

8    the points you made since she dropped?

9        MR. COPELAND:  Right.  So just in summary, I believe I

10   made the point that the revocation of release was, to our

11   understanding, never provided to petitioner nor to petitioner's

12   attorney.  We are not -- we don't really understand how, you

13   know, given that that was put in issue, how it is not included

14   in the government's submission.  That, we would put forth, that

15   that's irregular such that, you know, the statements here, which

16   are fairly self-serving, you know, it would have been helpful to

17   have actually provided the document that does have service

18   requirements on its face.

19       THE COURT:  Well, I agree, but if the A-File

20   documents -- and I will ask Ms. McBride to speak to this, but

21   presumably, based on DHS's declaration, the A-File documents a

22   series of notices he was given, regardless of whether a copy of

23   that notice, written notice was provided to you.

24       MR. COPELAND:  Right.  But the -- regardless of

25   whether it would be included in the A-file, there would also be

1    an additional obligation to provide it, which would in and of

2    itself be a violation of the agency's regulations and

3    procedures, which would be, you know, by extension an *Accardi*

4    and APA violation.

5         THE COURT:  And Mr. Copeland, am I correct Anthony

6    filed a request for an administrative stay which ICE denied?

7    That occurred in August; is that correct?

8         MR. COPELAND:  That is my understanding, yes, Your

9    Honor.

10        THE COURT:  All right.  Again, Mr. Copeland, even

11   assuming I could reach the merits, which I'm not sure at all

12   that I can based on the jurisdiction-stripping provision of the

13   statute, but even if I could, does Anthony have a

14   constitutionally protected right that ICE follow its own

15   regulations?

16        MR. COPELAND:  Absolutely, Your Honor, yes.

17        THE COURT:  Can you give me a case for that?

18        MR. COPELAND:  You could look at the *Damus v. Nielsen*

19   case in the District of Columbia.  I believe it is in our

20   papers.  That would go through sort of the *Accardi* Doctrine

21   analysis, you know, establishing that the violation of ICE's own

22   policies pertaining to procedures and processes that are

23   designed to provide an individual with some sort of right would

24   be an APA and a Fifth Amendment violation.

25        And additionally, there would be a number of other cases

following that, such as the *Villavicencio Calderon v. Sessions*
case in the Southern District of New York, which I also believe
is cited in our papers, the *S.N.C. v. Sessions* case, which is
also cited in our papers, I believe, and is also out of the
Southern District of New York.  And these cases are essentially
following the *United States ex rel. Accardi v. Shaughnessy*
decision, which is 347 U.S. 260 -- the relevant pin cites there
would be 266 and 268 -- from 1954, which subsequent Supreme
Court cases, *Morton v. Ruiz*, 415 U.S. 199, 235, 1974, which I
quote from now that says, it is incumbent upon agencies to
follow their own procedures even when they are possibly more
rigorous than would otherwise be required.

So breaches of the *Accardi* rule would constitute both a
Fifth Amendment due process clause violation, as well as a
violation of the APA.

There's an Eleventh Circuit case, *Rowe v. United States
A.G.*, 545 Fed. Appendix 888, 890, Eleventh Circuit 2013, that
stands for that proposition, as well as numerous others.

But I think that the best case in this regard would be the
*Damus v. Nielsen* case out of the District Court for the District
of Columbia, which itself cites to *Battle v. FAA*, 393 F.3d 1330
at 1336.  And that's a district -- a circuit -- a Circuit of
Appeals for the District of Columbia case from 2005.

THE COURT:  All right.  Doesn't the *Accardi* Doctrine
say the agency must follow its own regulations with respect to

1    the U Visa?  With respect to the U Visa, how did the agency not

2    follow its own regulations?

3         MR. COPELAND:  It didn't follow its own regulations

4    pursuant to the process of looking -- of the deferred action

5    process, as well as pursuing sort of making the assessment of

6    the bona fides of the U Visa application.

7         THE COURT:  What do you mean "deferred action

8    process"?

9         MR. COPELAND:  Well, so part of, you know -- what is

10   part and parcel of the U Visa process in terms of, you know, how

11   it's applied is that there's a deferred action component

12   whereby, you know, there's a bona fide determination on the

13   claim, and the deferred action process allows the U Visa

14   applicant to remain in the United States, as well as seek

15   employment authorization, which would be an --

16        THE COURT:  Wait, wait.  Isn't that the case only if

17   DHS decides he is eligible for U Visa?

18        MR. COPELAND:  That would be -- well, it wouldn't be a

19   determination of eligibility.  It would be sort of the much

20   lower threshold of the bona fide, you know, evaluation of the

21   case.  It wouldn't be the ultimate, you know --

22        THE COURT:  Has DHS made that lower-level decision?

23        MR. COPELAND:  Not to our knowledge, no.

24        THE COURT:  So you are basically saying until they do

25   that, they have to wait to remove him, even though there is a

1    valid removal order that's been in effect since 2011?

2            MR. COPELAND:  Our position is they have to follow

3    their processes, and if that means that they have to, you know,

4    not execute a removal order that they have elected not to follow

5    for seven years, then yes, you know, we would -- we would put

6    forth that they have to follow their process and whatever they

7    need to do to follow that process, that's correct, that's our

8    position.

9            THE COURT:  Do you dispute that the regulations allow

10   ICE to revoke an alien's supervision if there are changed

11   circumstances such that there is a significant likelihood the

12   alien can be removed?

13           MR. COPELAND:  We don't dispute that there are

14   circumstances where the order of supervision can be revoked.  We

15   do dispute -- which I don't think is what you are stating, but

16   our position would be that there's a requirement of certain

17   processes at a meaningful time in a meaningful manner

18   prerevocation.

19           THE COURT:  With respect to irreparable harm -- wait.

20   Hold up.

21       Ms. McBride, are you still there?

22           MS. MC BRIDE:  I'm here.  I'm still here.

23           THE COURT:  All right.  I heard a beep.  I was worried

24   we lost you again.

25       With irreparable harm, Mr. Copeland, it is undisputed that

1   Mr. Anthony can seek a U Visa from Sierra Leone; correct?

2              MR. COPELAND:  No, our position would not -- would be

3   that he would have the legal ability, but as applied to him as

4   someone who has not been to Sierra Leone in 40 years and someone

5   who has been determined by the agency to be a credible fear of

6   torture, although one not qualifying him for deferral of removal

7   by CAT, our position would be that it would be impossible for

8   him to continue to litigate this case from Sierra Leone,

9   particularly if the agency issues a substantial request for

10  further information.

11     We've got numerous clients who have been recently deferred

12  or deported to Sierra Leone who we struggle to even, you know,

13  find out their location, let alone be in communication with in a

14  manner to be able to effectively represent them and pursue their

15  claims.

16             THE COURT:  So there's a practical problem.  But as a

17  legal matter, he could pursue the claim from Sierra Leone;

18  correct?

19             MR. COPELAND:  He could pursue a portion of the claim.

20  He couldn't pursue the obtaining employment authorization, and

21  he also couldn't pursue the getting deferral through deferred

22  action such that he would be able to remain in the United States

23  as the pursuit of this claim goes on.

24     So while, you know, taking a broader view of just could

25  this claim, you know, continue, yes, it could, but could he

obtain sort of the full spectrum of the rights that he is
entitled to at least pursue, no.

THE COURT:  But again, staying here in the United
States while he does that, that's tied up with the removal
order, which has been in effect since 2011.  That's where I am
having a really hard time.  I think that you're essentially
asking me to address that, and I don't have jurisdiction to do
that.  There is a legitimate order in effect that he has
challenged and he has lost to date, but to the extent he has any
further challenge to that, it seems to me that he has to go to
the Fourth Circuit.  It is the removal order that you have a
problem with.

MR. COPELAND:  Well, respectfully, Your Honor, I don't
think that that's -- first of all, he would not be able to go to
the Fourth Circuit at this point.  And I think that the --

THE COURT:  And help me understand why he couldn't
move to reopen right now.  I'm having a hard time following
that.

MR. COPELAND:  Well, I think he could move to reopen
his removal proceedings, but that's not the claims that are
before this court and that he's pursuing.  I mean, the -- he
could request, you know --

THE COURT:  He could move to reopen, and then he could
petition for review, and he could raise the claims he's raising
here with them and say this should be delayed in order for us to

follow through with this U Visa process.

That, to me, seems like what the statute requires, not for me to interfere with the removal order.

MR. COPELAND:  Well, Your Honor, I think that our position would be that the Constitution would require more than that and that the -- also, just by pursuing the motion to reopen, he will be in the same position where the Department of Homeland Security will remove him, you know, without his opportunity to reach the -- to reach the Fourth Circuit.  So --

THE COURT:  But he could seek a stay.  My point is, the Fourth Circuit is the court to grant that, not me.

MR. COPELAND:  No, the Fourth Circuit would have no jurisdiction at this stage to grant that stay, right, so --

THE COURT:  But I don't have jurisdiction at this stage to do what you're asking.

MR. COPELAND:  Well, there's a decision from Tuesday in the District of New Jersey where the judge essentially looked at the issue that we are dealing with in terms of the motion to reopen process and granted the petitioner a stay for 14 days following the decision of the Board of Immigration Appeals for the very reason that we're bringing up, is that the procedure in that context doesn't provide for an adequate process to withstand suspension clause analysis.

So in that case the district judge, who was Judge McNulty, in a case called *Sean B. v.* -- I forget the last name,

*Sean B. v. McAleenan*, 19-10529, District of New Jersey, Docket
Number 30, from September 3rd, 2019, you know, which is looking
at that exact issue, is that the procedures that are provided
don't provide the adequate process to survive suspension clause
review.

       And that's what's distinct about that case, is it is a
challenge that is appropriately within the channel that 1252
creates, you know, for those types of claims, which is
challenging at the Board of Immigration Appeals, going to the
Fourth Circuit, and dealing with your removal order in that
manner.

       What's distinct about Mr. Anthony's claim and which is more
similar to the claims made in *Villavicencio Calderon* and the
*Martinez v. Nielsen* case out of also the District of New Jersey
is that he is pursuing a claim that would never even reach the
Board of Immigration Appeals.  It's a procedure that Congress
has specifically written and created, and now, you know, the
agency is trying to essentially short-circuit it, you know.

       The way, I believe, the judges articulate it is they've
created a right without a remedy and given a man a job without
the tools to perform it, such that this claim is only at this
point appropriately before the circuit -- the district court
because there is no way for him to get the requisite judicial
review pursuant to the suspension clause in any other forum.

       So while, you know, in a number of cases 1252 will strip

jurisdiction, there's courts across the country who have found

it is claim specific, and in one instance it can strip

jurisdiction, and in another instance it can't.

And in this particular circumstance, our argument would be

that it, A, doesn't strip jurisdiction.  If it were to, it would

violate the suspension clause.  And the precise claims that

Mr. Anthony is pursuing here are not claims that, you know,

would be cognizable before the Board of Immigration Appeals at

this stage.  The Board of Immigration Appeals won't address

constitutional issues.  All of Mr. Anthony's claims are, you

know, derived from the Fifth Amendment and his procedural

rights, his legal entitlement to lawful process.

THE COURT:  But I still don't get why you can't raise

all these claims before the court of appeals.  That's the piece

I'm missing.  Why doesn't that remove any suspension clause

problem?

MR. COPELAND:  Because the U Visa claims would not

be -- would not be defined by the statute as claims that are

channeled to the court of appeals.  So the only way for such a

U Visa claim to reach the court of appeals in this context would

be for it to go through the lower court prior to reaching the

court of appeals.

But 1252 is not -- the Supreme Court, I believe, gave the

example of if detainees crash in a car on their way to jail,

their claims, tort claims are not stripped just because it's

1    incident to, you know, removal proceedings.

2            THE COURT:  But you are raising constitutional claims,

3    and to the extent you have any legitimate constitutional claims,

4    the court of appeals can hear those.

5            MR. COPELAND:  Well, they can hear those after the

6    Court -- but they can only hear those once they're properly

7    before them.  And there isn't a final removal order that we are

8    challenging here such that it would not -- we would not go to --

9    the case wouldn't be channeled past the district court to the

10   court of appeals.  This is not a challenge to a removal order.

11      So that's the critical difference, is the fact that there

12   isn't the sort of claim here that could be, you know, pursued

13   before the court of appeals means -- well, it couldn't be

14   pursued before the court of appeals skipping the district court.

15   We would need to go to the district court prior to that, because

16   this isn't one of the claims that 1252 is defining as being

17   channeled to -- past the district court.

18           THE COURT:  All right.  Mr. Copeland, anything else?

19           MR. COPELAND:  I mean, just in terms of, you know,

20   these issues, there's been a number of questions that we -- you

21   know, we would appreciate the opportunity to brief further to

22   the Court, and also, in terms of if there is a decision to lift

23   the stay that's in place, we would request that there be a

24   temporary extension such that we would be able to seek review of

25   that decision which we believe we would appropriately at that

1    point be able to pursue at the circuit level.

2              THE COURT:  All right.  Ms. McBride?

3              MS. MC BRIDE:  Your Honor, the Court has laid out the

4    arguments that we made in our papers.  Respondents believe that

5    1252 does divest the district court of jurisdiction over this

6    order.

7         It appears that the petitioners tried to get around the

8    removal order by attempting to imply that the petitioner has

9    some protected interest in the U Visa application, and that's

10   just not the case.  There is no suspension clause violation

11   because the petitioner is not seeking release of the TRO order,

12   and he can still receive -- he can still apply and go through

13   the process for the U Visa even if he is deported.

14        So that is not the issue here.  The issue is he is trying

15   to get around the order to remove him by arguing that he has

16   some interest in the U Visa.  He hasn't even been placed on the

17   waiting list for the U Visa yet, but he can still pursue that

18   process for the 1991 assault that he sustained even after he's

19   been deported.

20             THE COURT:  So Ms. McBride, it seems to me the

21   critical question for jurisdiction is whether the U Visa process

22   claim falls within the decision or action for execution of a

23   removal order.

24        What is your position on that question?

25             MS. MC BRIDE:  And Your Honor, it does not -- he could

1    still pursue that.  They're separate matters.  He can still

2    pursue that after being removed from the country.  He is not

3    going to lose his right to pursue the U Visa.

4            THE COURT:  All right.

5            MS. MC BRIDE:  He is not going to be able to request

6    work and the other things that he could have done if he had been

7    able to remain in the country, but that's not going to stop him

8    from being able to pursue the U Visa and, perhaps, take that

9    step until that issue is resolved, but they're two separate

10   matters.

11           THE COURT:  All right.  You've filed an opposition,

12   and you have titled it a "motion to dismiss," but the briefing

13   schedule the parties proposed was exclusively one for motion for

14   preliminary injunction and briefing on that.  So I'm not

15   considering this as a ripe motion to dismiss before me at this

16   point.

17       As I understand it, based on the declaration you submitted,

18   according to the A-File at least, it appears that Anthony did

19   receive notice of the revocation release.  Can you tell me

20   whether my interpretation of your declaration is correct?

21           MS. MC BRIDE:  Your Honor, yes.  The declarant signed

22   it under penalty of perjury.  So that is correct.  He did

23   receive notice of the action.

24           THE COURT:  He signed what under penalty of perjury?

25   You mean the declarant?

1          MS. MC BRIDE:  Yes, the declarant.

2          THE COURT:  And specifically, what exactly was the

3    notice Anthony received?

4          MS. MC BRIDE:  I'm just looking through this.  Court's

5    indulgence.

6       (Pause.)

7          MS. MC BRIDE:  So Your Honor, on January 21st, 2011,

8    in paragraph 12 of the declaration, he was released from

9    custody, and then he was issued notice to appear for charges of

10   removability under the INA statute.

11         THE COURT:  Mr. Copeland claims that there is a

12   written notice that he should have been provided and was not

13   provided.

14      Can you tell me whether that's true or false?

15         MS. MC BRIDE:  Your Honor, I'm not sure.  I just know

16   that notice was provided to him in January of 2011 based on the

17   declarant's information that he was provided.

18         MR. COPELAND:  Your Honor, if I may assist, what's

19   mentioned in paragraph 12 is the notice to appear, which is the

20   sort of -- the charging document for the removal proceedings.

21      So what I believe Respondent's -- the appropriate paragraph

22   of the declaration that I would direct Ms. McBride to is 21.

23         THE COURT:  Well, Ms. McBride, if you don't have any

24   additional knowledge other than what's stated in the declaration

25   and you are just reading it, I can do that.

1    But I was not sure what the declaration meant by "notice."

2    And to the extent you know whether that included the written

3    form that Mr. Copeland is saying Anthony didn't receive, that

4    was the purpose of my question.  If you don't know --

5    MS. MC BRIDE:  Oh, I'm sorry.  The only thing I know

6    is what is written in the declaration.  I apologize to the

7    Court.

8    THE COURT:  All right.  Ms. McBride --

9    MS. MC BRIDE:  I can find that out.  That's all I know

10   based on the information I was given.

11   THE COURT:  Do you have any further information on the

12   status at all of his U Visa application?

13   MS. MC BRIDE:  Your Honor, only that there are many,

14   many U Visa applications in process, and his is among the many

15   that are in process.  I don't know in fact where it is exactly.

16   As I indicated when I started, I would have to get

17   clearance and approval to be able to get specific information

18   regarding that, and it cannot be -- that information cannot be

19   in open court, and the attorneys who represent the plaintiff,

20   the petitioner would have to have something in writing

21   indicating that they can get that information.

22   THE COURT:  I'm sorry.  I didn't understand that.

23   MR. COPELAND:  So the information contained in a

24   U Visa application is protected by the Privacy Act.  And so if

25   the Court were either to order it or if DHS has a standard sort

1    of form for permitting release of that information, you know, if

2    that form was provided to our client, he would be more than

3    willing to sign it, or the Court could simply order it, and that

4    would be one of the exceptions to the Privacy Act to allow the

5    release of that information.

6            THE COURT:  So for me even to know the status of the

7    application, we have to have a waiver from the -- from

8    Mr. Anthony?

9            MR. COPELAND:  I mean, if you ask for it, you get it.

10           THE COURT:  All right.  Ms. McBride, do you believe

11   the order of suspension gives Anthony a constitutionally

12   protected liberty interest?

13           MS. MC BRIDE:  No, Your Honor.

14           THE COURT:  And why not?

15           MS. MC BRIDE:  Your Honor, Court's indulgence.

16       (Pause.)

17           MS. MC BRIDE:  Your Honor, in order for that to be

18   correct, he would have to have some interest in the U Visa

19   process, which he does not.  That's something that is

20   discretionary that is provided by the agency, and it's

21   discretionary.  He doesn't have an interest or a right or

22   anything to receive the U Visa --

23           THE COURT:  Well, I am talking about the order of

24   suspension status.  So as I understand it, before that can be

25   revoked, he has to have notice?

1          MS. MC BRIDE:  Correct.

2          THE COURT:  And according to the declaration, on

3    July 31st, 2019, ICE served him with the notice of revocation of

4    release?

5          MS. MC BRIDE:  That's correct.

6          THE COURT:  And this is the form that Mr. Copeland

7    says he believes Mr. Anthony did not receive notice of because

8    ICE hasn't given him a copy of that document?

9          MS. MC BRIDE:  Your Honor, that's -- I would have to

10   speak to the agency to get the specifics of the notice, but they

11   did provide notice.  They didn't provide me the exact way they

12   provided the notice.  I would have to get that information.  I

13   just don't have that information right now.

14         THE COURT:  Okay.  And to the extent the agency did

15   not follow its own regulations, to what extent does

16   Mr. Anthony -- to what extent is that a constitutionally

17   protected right, that ICE actually follow its regulations?

18         MS. MC BRIDE:  Your Honor, I'm not sure.  I would have

19   to look into that, but -- I'm not sure.

20         THE COURT:  And your position on whether Anthony has

21   met the eligibility criteria for a U Visa?

22         MS. MC BRIDE:  Your Honor, I have no information on

23   that.  I just know -- I have no information on the actual -- the

24   status of his U Visa eligibility.  The agency has not provided

25   me with that.  I just have the information that he applied for

1   that and that there are many people who are in that process of

2   being reviewed for that, and I don't have any more details about

3   that.  I would have to get information about that.

4        THE COURT:  All right.  Ms. McBride, what is your

5   position on my authority to administratively stay any execution

6   of removal if I were to rule in favor of the government in order

7   to allow Mr. Anthony to appeal my decision that I lack

8   jurisdiction?

9        MS. MC BRIDE:  I'm sorry, Your Honor.  Other than the

10  fact that the statute 1252 divests jurisdiction to this court, I

11  don't think -- I don't understand your question.

12       THE COURT:  If I were to agree with you and determine

13  that 1252 does divest this court of jurisdiction, Mr. Copeland

14  has said that he would like to appeal that decision, and the TRO

15  is set to expire on Monday.  And if I rule, presumably, it would

16  expire immediately if I lack jurisdiction.

17       But my question to you is, would the government agree that

18  I could administratively stay any removal, in other words

19  continue the temporary restraining order in order to give him

20  time to appeal my decision?

21       MS. MC BRIDE:  Your Honor, we are agreeable

22  additionally to a week based on our previous request.  So that's

23  the only thing I could do.  We would agree to one more week.

24  Other than that, I couldn't agree to anything further beyond a

25  week.  I had already received the agency permission to do that

 1    when I requested an enlargement of time for the Court a couple

 2    of weeks ago.

 3            THE COURT:  So Ms. McBride, it sounds like you think

 4    you can provide some additional factual information from the

 5    declaration if I give you more time, and Mr. Copeland, it sounds

 6    like you want to make additional arguments.  I am reluctant to

 7    receive more briefing on this.  I feel like it's been fully

 8    briefed.  I will allow you to file a no more than five-page

 9    supplemental brief addressing any issues that you would like to

10    by Monday morning.

11        If I were to rule against you, Mr. Copeland, it sounds like

12    the government would agree to extend the stay of the removal for

13    one week, which is until next Friday.  Presumably, that gives

14    you enough time to seek further stay in the court of appeals.

15            MR. COPELAND:  Thank you, Your Honor.  Yes, I think

16    that that would provide that time.  In the supplemental filing,

17    I will provide some authority for the granting of a stay pending

18    appeal, but it seems like that's not going to be something

19    that's problematic in this case.

20            THE COURT:  All right.  I know it's Friday, but I do

21    think time is of the essence here.  So I am going to ask that

22    you file any briefs by 9:00 a.m. Monday.  And once I receive

23    them, I will be in touch and likely schedule another status

24    hearing for me to issue my ruling.  I would prefer to do that so

25    that we can get a quick ruling.

1    So just so I know now so when I get the briefs I know what

2   your schedules are, what are your schedules Monday afternoon and

3   Tuesday?

4         MR. COPELAND:  So I am actually being sworn in at the

5   District of Columbia Monday morning at 9:00 a.m., and then I

6   have an appearance at 4:00 p.m. that day in the Southern

7   District of New York.

8         THE COURT:  So you will be in court at 4:00 p.m. in

9   New York?

10         MR. COPELAND:  Yeah.  So I believe I am on a train

11   leaving D.C. at 11:50.

12         THE COURT:  All right.  And Tuesday morning?

13         MR. COPELAND:  Tuesday morning, I am entirely free.

14         THE COURT:  And Ms. McBride?

15         MS. MC BRIDE:  Your Honor, on Tuesday, I am free until

16   2:00 p.m.

17         THE COURT:  All right.  So why don't we go ahead and

18   set a time for Tuesday morning to ensure that we are all

19   available.  So we will return on Tuesday morning at 10:00 a.m.

20    Hold on.  I just realized I have a detention committee

21   meeting early that morning that ends at 10:00, and then I have a

22   status conference at 10:30.  But even so, I think I do want to

23   set this at 10:00 a.m. for Tuesday, September 10th.

24    And to be clear, to the extent either party wants me to

25   consider any additional legal authority, you need to file

1  something by 9:00 a.m. Monday morning, no more than five pages

2  long, and Ms. McBride, to the extent, or Mr. Copeland, to the

3  extent either of you have any additional facts to put in your

4  declarations, you can supplement the declarations as well.

5          MR. COPELAND:  Yes, Your Honor.

6          MS. MC BRIDE:  Thank you, Your Honor.

7          THE COURT:  That's by 9:00 a.m. Monday morning.  All

8  right?

9          MS. MC BRIDE:  Yes, Your Honor.

10          MR. COPELAND:  Thank you.

11          THE COURT:  Is there anything else we should address?

12          MR. COPELAND:  Not from the petitioner.

13          MS. MC BRIDE:  Not from the respondent.

14          THE COURT:  Just to be clear, Ms. McBride, you have

15  agreed to continue the TRO which expires on Monday; correct?

16  That's what I understood you to say earlier.

17          MS. MC BRIDE:  Yes, Your Honor, that is what I said

18  earlier.

19          THE COURT:  Okay.  So I will be putting out an order

20  that based on your consent the temporary restraining order is

21  continued until next Friday, you said?

22          MS. MC BRIDE:  Yes, Your Honor, correct.

23          THE COURT:  All right.

24          MR. COPELAND:  And Ms. McBride, you will communicate

25  that with the relevant agency personnel?

1          THE COURT:  Yes.

2          MS. MC BRIDE:  Yes.

3          THE COURT:  They need to be informed.  He cannot be

4    removed on Monday or Tuesday.

5          MS. MC BRIDE:  Exactly.  I am going to let them know

6    now.

7          THE COURT:  And, Ms. McBride, the other thing that

8    would be helpful for me is your position on the TRO or some

9    administrative stay continuing until Friday in order to give

10   Mr. Copeland time to appeal my decision in the event I rule in

11   favor of the government.

12         MS. MC BRIDE:  Yes, Your Honor.

13         THE COURT:  So if procedurally there is another way we

14   should be doing this, I would like to hear your position on

15   that, as well as Mr. Copeland's.  All right?

16         MS. MC BRIDE:  Yes, Your Honor.

17         THE COURT:  Thank you both.

18         MR. COPELAND:  Thank you, Your Honor.

19      (Proceedings adjourned at 10:16 a.m.)

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick_____        September 7, 2019_____

SIGNATURE OF COURT REPORTER           DATE